At this time, we'll hear the Hartford Roman Catholic Diocese versus Interstate Fire and Casualty. Thank you. Good morning, Your Honor. My name is Richard Neumeyer. I represent Interstate in a coverage dispute involving four sexual abuse claims which were settled between 2010 and 2012. Interstate issued excess indemnity policies from September 1, 1978 to September 1, 1985. There is no duty to defend. I first want to talk about the assault and battery exclusion and spend 30 or 40 seconds about what the parties agree. The parties agree below that the assault and battery exclusion was purely a question of law for the court to decide. In fact, this is also agreed on appeal. The parties agree below that the assault and battery exclusion was not ambiguous. And at footnote, the district court judge says, well, I find it is ambiguous, but never got around in a 30 page opinion to suggesting- Parties have different interpretations, so- We do. They both, both sides might say it's unambiguous, but the fact that there's disagreement might suggest otherwise, huh? Well, let me make the final point of agreement. The parties agreed that the Ninth Circuit decision was right on point. The Ninth Circuit applied Arizona law. And the parties agreed that both Arizona and Connecticut law follow the plain meaning rule in interpreting insurance- The Ninth Circuit decision was a split decision, so there was disagreement there among the three judges. That's right, Your Honor, and both the dissent and the majority said we're following the plain meaning rule. So the only disagreement is really on the merits. That is, what does the plain meaning rule mean with respect to the assault and battery exclusion? And we have, frankly, some other, we have the district court judge below also applying the plain meaning rule. So here you have several judges, and I just assume they're all equally proficient, Your Honor. I've got no means of deciding otherwise. Applying the same rule to the same language, to the same question, coming up with different results. And I suggest that's a strong reason why the question should be certified to the Connecticut Supreme Court, because how- Basically, if it's ambiguous, you lose. I concede that, and that's another point we agree on, Your Honor. If the contract is ambiguous, we lose. So that's another area of agreement I left out. If it's ambiguous, so why don't we assume that it's unambiguous, at least for now? That's what everybody has asserted, Your Honor. And I can't improve on the Ninth Circuit reasoning, the majority reasoning, that such insured refers to any insured. Your Honor, my time is very limited. I do want to say a few things about the- Such insured does not mean any insured. Well, that's the question. Such refers to that which has just been identified, or narrowed, or described above. That is the argument, Your Honor, and that's the question. And the question is, is that- If you're right, then why didn't you just exclude assault and battery? Say that is a claim that this insurance doesn't cover. That would get you there. All these other words are going on here, and they must mean something. Well, that's true, Your Honor. And frankly, there's been some difficulty in construing this language, because we have different judges looking at the same language, applying the same rules, and reaching different conclusions. I can't improve on the reasoning of the majority opinion, Your Honor, in the Ninth Circuit. And I would just ask you to be persuaded by that, and I know my time is very limited. And I'd just like to say something about the occurrence clause, if I could. Again, we have a lot of agreement, well, a lot of agreement. We have some agreement. I want to spend 20 or 30 seconds this time on the agreement. We agree that an essential element of collateral estoppel is that the issue in the current case is identical with the issue raised in the prior adjudication. The Jacob Doe case is what we're talking about, of course. We also agree that in Jacob Doe, the factual issue was whether the archdiocese conduct was reckless. Finally, we agree that there is no evidence that the archdiocese intended sexual abuse. We disagree as to whether an objective standard should apply, and if so, whether the finding of reckless conduct in Jacob Doe means that under an objective test, the archdiocese expected future abuse. We also have a disagreement as to whether other conduct of the archdiocese, which is set forth in some detail in pages four and five of our reply brief, constitutes reckless conduct. Well, why can't the diocese rely on the opinion of Dr. Peterson, who was of the view that if the alcoholism problem is removed, that Father Ferguson would be able to control his predilections? That's only one tiny piece of evidence, Your Honor. I would refer you to a detailed discussion of pages five and six of my reply brief for other evidence of reckless conduct. And it's too detailed for me to repeat in the time that I have here, Your Honor. Now, in terms of what is expected or intended, don't we have a fact determination here? We- A five day trial? I don't think there is a fact determination in the trial, it was actually ten days. Ten days. It was a ten day trial with 700 exhibits, Your Honor. I don't think there is a- Well, more than you have a finding that comes out at the end of all of that. And it's found that the, I think the archbishop, the bishop did not form this expectation or intention. Well, we agree with intention, Your Honor. The disagreement is whether an objective or a subjective test should apply. And if a subjective test should apply, should the district court or this court follow the line master test that says in exceptional circumstances, that is where there is reckless conduct, an objective test should apply. And we believe there are public policy reasons- It's not as to Father Latimus, I mean, it doesn't matter whether it's subjective or objective, right? Yeah, I agree as to- There's no evidence that there's any notice with respect to Father Latimus. We also have an agreement on Father Latimus, I left that out, but we do agree on that. That's one claim. The other is- What about Crowley? Crowley, the factual finding is that the archdiocese doesn't learn of the prior abuse until March of 1983. So does that make it difficult for you? Father Crowley is much more difficult. But again, I would refer you to pages five and six of our reply brief for a discussion of reckless conduct and the way the archdiocese approaches this in general. And again, with respect to the occurrence language, the district court said that there was no Connecticut appellate cases that had examined the applicable standard for the occurrence definition in this case. There are trial court cases. There are trial court cases, that's true. Many of them is distinguishable. My time is up, Your Honor. I've reserved some time, so- You have reserved rebuttal. We will hear you then. All right. Thank you. Good morning. Good morning, Your Honors. My name is David Friedman of the law firm of Martha Kalina, and I represent the Hartford Roman Catholic Diocean Corporation, the plaintiff appellee and cross appellant in this case. I'd like to focus my discussion on just two of the issues that are involved in this case. I rely on my brief for the rest. And those two issues are first, does the assault and battery exclusion clearly and unambiguously and to a high degree of certainty exclude the archdiocese's claims from indemnity? And the second issue is, should this court accept interstate's invitation to disregard the subjective standard for determining whether there has been an occurrence that has been adopted by the Connecticut Supreme Court and apply an objective standard? With respect to the first question, again, the exclusion that we're dealing with is a relatively short exclusion. And it reads, the policy excludes coverage for liability of any assured for assault and battery committed by or at the direction of such assures. Now, the Connecticut rules of construction with respect to exclusions, which that's what this is, requires that there has to be a high degree of certainty that the policy language clearly and unambiguously excludes the claim. And that's set forth in the Pasiak case, which is set forth in our brief on page 18. Unlike other rules of construction that are typical in the insurance context, an insurer who seeks to exclude a claim under an exclusion must satisfy this heightened standard. The exclusion does not apply in this case, Your Honor, for several reasons. First, and one that's not really been addressed by the opposition in this case, is the terms of the policy identify the archdiocese as the insured. Employees, such as the priests, are also identified as insurers, but only when acting within the scope of their employment. No claim has ever been made in this case that the priests were acting within the scope of their employment, nor could such a claim be made. Quite the contrary, in their reservation of rights letters in this case, interstate declared that the priests were not insured, for this precise reason. And that's in the record at A1936, that's one of the reservation rights letters, the others are identical. Now, in this case, the only insured who is in this case is the archdiocese. And there is no question that the archdiocese itself did not commit, nor did it direct any insurer to commit an assault and battery. Applying a plain reading of this exclusion, it clearly creates a subgroup of potential insurers, those who commit or direct assault and battery. And then it says that the claims for liability of that subgroup have no coverage. Or, using the terminology that the courts have used, which I find a little bit difficult and convoluted, is that when the exclusion uses the term such, that word refers to the quality just specified, and in this case, that's the subgroup of potential insurers who committed or directed the assault and battery. It does not refer to the other subgroup of potential insurers who did not commit or direct an assault and battery. Interstate's position basically is that such means any, and that they therefore just completely ignore the qualifying language that creates the subgroup of potential insurers who either committed or directed an assault and battery. Their construction simply does not give effect to every word in the exclusion and ignores the problem that the archdiocese is the only insured in this case. Now, they rely heavily on the Ninth Circuit decision in the Diocese of Phoenix. It was a two to one decision with a strong dissent. We believe it's just simply wrongly decided they applied the same rationale here. The dissent takes issue with the plain reading of the statute. And we simply have a situation where we have several judges who have read it our way, two judges who have read it the other way, and under the more deferential standard of construction for exclusions and insurance policies, we think that, your honor, that they're clearly, it should be read in favor of the insured. One thing to point out with respect to the Ninth Circuit is they're applying Arizona law and as far as I can tell, Arizona does not have that heightened standard of construction for exclusions and insurance policies, which would make a big difference. Turning to the second issue. Yes. With respect to Father Ferguson and the second claimant, Matthew Doe, at that point, the archdiocese knew that there was a history of sexual abuse. They knew that, and he then went and had some. And so, was it really a surprise that it would happen again? Well, they relied on the professionals to assist them in whether or not there was a risk, and we're advised that there wasn't. It didn't seem to make sense to place him again in a situation with boys. Well, it wasn't, I mean, again, it's not like he did his treatment and they just put him in there. They didn't. There was a, we're not disputing that there was a finding in Jacob Doe, that there was negligence and or recklessness with respect to the way they handled it. The question, though, with respect to the occurrence is whether or not, what's the standard that you apply? And I think that's one area where I agree. Is there coverage for reckless acts? Absolutely. I mean, that issue has been addressed under where you have a subjective standard. The only thing that's not covered, frankly, is intentional conduct. And probably in the situation we had a willful blindness type situation, that probably also is not covered as well. The suggestion, however, in this case is that your honors should adopt, I think that's the actual wording of the argument in the brief is, is that this court should adopt an objective test in determining whether or not there's an occurrence. I respectfully submit that's not the role for this court to adopt for the state of Connecticut a rule which is contrary to what they've actually announced is the rule. Your adversary is really arguing we ought to adopt it or ask the Supreme Court of Connecticut to tell us. But that's notwithstanding the fact that the Supreme Court has already announced what the rule is. And indeed, I cite you to the, I'll mispronounce the name of the case. Well, Wolukowicz on page 18, footnote 18. This is a Connecticut Supreme Court case. And in that footnote, the court went at length, perhaps it was in dicta, but dicta certainly is an indication of how the court would rule, saying in Connecticut we apply a subjective, not an objective test. And in fact, they go so far as to say that to apply an objective test would, in many circumstances, effectively take away the whole purpose of insurance, which is an insurance. We have insurance because people made mistakes. And even in negligence, they should have acted differently. But if you're going to apply an objective test and say they should have acted differently, therefore there's no coverage, you've effectively taken away insurance. And so to say under the circumstances, well, we would like to certify it to the Connecticut Supreme Court because we would like them, frankly, to change the law. That's not what the purpose of certification is. It's not to give the Connecticut court an opportunity to change the law. The question is, has the Connecticut Supreme Court articulated what the law is? And if they have, then this court is in a perfectly suitable position to deal with it. This suggestion that the court should follow line master is, I think, indicative of exactly what the problem is. And that's line master is a 25 year old superior court case, which has never, as far as I know, been referenced, cited, or approved by the appellate courts. So why in the world is this court going to now declare that for public policy reasons, we think the state of Connecticut should adopt the line master test? That's not the court's role. Now, further in terms of certification, the one thing that I think is really important to emphasize, and that is that Interstate did not seek certification when this case was before the district court. They decided at that- District courts can't certify. It's in New York, might be different. Yeah, I believe, yeah, my understanding is that they can, and that they did not seek to do so. And they felt and took the position that there was no, that the district court was fully armed with the information that they needed based on what the law was to decide the case. Then they lost at the district court, and now they are announcing that in fact, the law is simply not, that they need some guidance from the state of Connecticut's Supreme Court with respect to this issue. I respectfully request to submit that under these circumstances, certification is simply not, it's not appropriate or necessary. Thank you. Thank you, your honors. We'll hear from Roboto. Thank you, your honor. I must admit we have some more areas of agreement. We agree that the purpose of certification is not to ask the Supreme Court of Connecticut to change the law. The fact is that the district- Did the district court have the power to certify in Connecticut? I'm not sure about the answer to that, your honor. I think the answer is yes, but- I think the answer is yes. Yes, but the difficulty here, your honor, is we had a motion for summary judgment, cross motions, allowed and denied in part, and then we have a trial on the merits. Then we have, as soon as that happens, judgment enters, and then we get a voluminous post-trial motion, which the trial judge takes a while to work on. We don't want piecemeal litigation. We want the case to get resolved at the district court level. And frankly, I'm the appellate lawyer, your honor, and a notice of appeal was filed, and I got the case. And it's 700 exhibits, thousands of pages of trial transcript, 150 pages of the memo of decisions by the judge. So it took a while for me to read this, frankly, to get a handle on what was what. And you have repeated statements by the trial judge that there is no controlling Connecticut law on this question, on that question, on another question. And she's right. On the occurrence question, she's right. The question is, and we don't have a controlling case on Connecticut law, where you have reckless conduct for most of what's involved. And we say, we argue, that as a matter of public policy, it's not in the interest of a public policy interest to have other insureds who are not reckless pay for this insured who is reckless. And we give some examples of this. Well, public policy also includes assurance that victims get compensated. That's right. That cuts the other way. It does cut the other way, your honor. But in the environmental area, we have the same thing. You can have an accident, but if you know that you're continuing to pollute and you do nothing about it, that's reckless conduct. If you do nothing about it. If you do nothing about it. And here, what was done about it was frankly inadequate. They never told anybody that the priest had this history. They never warned anybody. They never reported it under the Connecticut statute. It goes on and on on pages four and five. Your honor, my time is up. We have your argument. Thank you both. We'll reserve decision.